## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MARGARET CONE**
**5701 Woodview Pass**                                       )
**Midland, MI 48642,**                                       )
                                                             )
          *Plaintiff*,                          )
                                                             )
   **v.**                                                )  **Case No.   1:12-cv-1826**
                                                             )
**THE UNITED ARAB EMIRATES**                                 )
**3522 International Court, NW**                              )
**Suite 400**                                                )
**Washington, D.C. 20008,**                                  )
                                                             )
    *Please serve:*                                      )
                                                             )
   **HH Sheik Abdullah bin Zayed Al Nayan**              )
   **Minister of Foreign Affairs**                       )
    **of the United Arab Emirates**                   )
   **UAE Ministry of Foreign Affairs**                   )
   **Main Office**                                       )
   **Abu Dhabi, UAE**                                    )
                                                             )
         *Defendant.*                          )
_____)

## COMPLAINT

Plaintiff Margaret Cone, by and through undersigned counsel, hereby brings this action

against Defendant The United Arab Emirates, and states as follows:

## JURISDICTION AND VENUE

1.  This Court has jurisdiction pursuant to 28 U.S.C. §1330 and 28 U.S.C. §1605(a)(2) in

that the Defendant is a foreign state that engaged in commercial activity in the United States.

Venue is proper in this Court pursuant to 28 U.S.C. §1391(f)(1).

## PARTIES

2.  Plaintiff Margaret A. Cone ("Cone"), is a citizen of the United States who currently

resides in the State of Michigan.  Cone, an attorney and native of Michigan, is the founder and

principal director of the World Leadership Program ("WLP").  Cone is a graduate of the

University of Michigan, and was an Executive Assistant to the Mayor of Detroit in the 1980's.

In 1992, she joined the Clinton administration and has since worked in Washington, D.C.  Over

the last ten years, Cone has been actively involved in Middle East issues, with a particular

emphasis on Christian/Muslim relations since 2004.

3.  Defendant The United Arab Emirates ("UAE") is a foreign state as defined in 28

U.S.C. §1602, *et seq*.  The UAE maintains a diplomatic presence in the United States through its

Embassy located in Washington, D.C.  As described below, the UAE engaged in commercial

activity in the United States with Cone.

## FACTUAL BACKGROUND

4.  WLP is an academic program whose mission is to foster connections and improve

intercultural understanding among religious scholars in the United States and the Muslim Middle

East, giving them an opportunity to study and interact with each other.  The WLP also provides

Middle Eastern students with an opportunity to travel to the United States, experience American

culture, learn the English language, and educate American participants in the program about

Islam and Arab culture.  In particular, the WLP is designed to foster and enhance relationships

between future religious leaders of the Middle East and their counterparts in the United States,

with the goal of laying the groundwork for mutual understanding, respect and tolerance.

5.  Cone developed the concept of the WLP over a period of several years.  In 2004,

Cone began her discussions about the concept with Sheikh Ahmed Tayyeb, the Grand Imam of

al-Azhar ("al-Azhar"), the world's chief center for Islamic studies.

2

6. The WLP was to include fourteen weeks of English language instruction for the al-Azhar participants in Cairo, as well as continued English language study and a cultural immersion program in Chicago, Illinois and Ann Arbor, Michigan.  The highlight of the program was to be a two-week program for both American and Middle Eastern participants at the International Institute at the University of Michigan ("UM").

7. In early 2008, Cone sent a copy of the proposal for the program to UM Professor Sherman Jackson, an Islamic studies professor.  After several meetings and telephone conversations, Professor Jackson agreed that the program would be a rewarding opportunity for the International Institute at UM and offered his support on behalf of UM.  Professor Jackson also stated that he would discuss the program with Professor Mark Tessler, Director of the International Institute at UM, and asked Cone to send Professor Tessler a copy of the proposal for the program.

8. In September 2008, Professor Jackson stated that UM would support the project, and that UM would host the WLP at the International Institute under his faculty direction.  Professor Jackson emphasized that UM would not be responsible for financing or staffing the project.  As a result, Cone went forward implementing the WLP, but did not receive input or direction from UM.

9. In or about June 2009, Cone and her colleagues traveled to the UAE and met with H.H. General Sheik Mohamed bin Zayed Al Nayan, the Crown Prince of Abu Dhabi ("Crown Prince"), to seek a two-year funding commitment from the UAE for the WLP.  The UAE Ambassador to the United States, Yousef Al Otaiba ("Al Otaiba"), was present at this meeting. During the course of this meeting, the Crown Prince expressed his views about the importance of

moving beyond religious and cultural divisions to foster a greater dialogue between the United States and the Middle East.

10.   At the end of the meeting, the Crown Prince directed Cone to coordinate the UAE's involvement in WLP with Al Otaiba.

11.   At all times relevant to this Complaint, Al Otaiba acted on behalf of the UAE with actual or apparent authority, and represented, both expressly and implicitly, that he spoke and acted on behalf of the UAE.

12.   In August 2009, Cone met with Al Otaiba at the UAE Embassy in Washington, D.C. to further discuss the WLP, and Cone gave him a hard copy of the WLP budget.  At the meeting, Al Otaiba carefully reviewed the budget, and asked several questions.  He stated that the budget was very reasonable, and that he had expected that the requested funding would have been for a much higher amount.

13.   On or about September 7, 2009, Cone received an e-mail from Al Otaiba, on behalf of the UAE, stating that the UAE would fund the WLP for a two-year period.

14.   Al Otaiba, on behalf of the UAE, agreed that the funding from the UAE would be put in place based on the budget Cone had submitted to Al Otaiba in August 2009.

15.   In October 2009, Al Otaiba requested that Cone e-mail him another copy of the WLP budget and proposal, so he could forward the documents to the Court of the Crown Prince.  The budget included allocations for salaries (including salaries for faculty, research and administrative staff, and consultants in Egypt and the United States), and other costs related to the program such as tuition, text books, travel expenses, data processing, research supplies, students' per diems, and lodging.  Cone's  compensation was budgeted as a consulting fee.

16.   Cone e-mailed the requested documents to Al Otaiba and included language suggested by Professor Jackson for Al Otaiba to use in a letter to UM's International Institute, confirming UAE's agreement to fund the program.

17.   In November 2009, Al Otaiba, on behalf of the UAE, wrote to Professor Tessler at UM's International Institute confirming the UAE's agreement to fund the WLP.  The letter states in pertinent part:

> On behalf of the UAE Government, I am pleased to make a contribution of $2,033,590 to the University of Michigan for use in funding the new World Leadership Program. The World Leadership Program (WLP) has very worthwhile objectives that are of particular interest to me.

*See* Exhibit A attached hereto.

18.   The letter further stated that Al Otaiba approved the budget previously submitted by Cone, and specified that the funding was contingent upon the WLP's adherence to the budget, with reasonable adjustments as determined by Professor Jackson.  The letter also stated that disbursements would be directed by Professor Jackson, in consultation with Cone.

19.   In reasonable reliance on the UAE's agreement to fund the WLP, Cone traveled to Egypt in the mid-November 2009 to announce the UAE's agreement to fund the WLP, and to discuss with Sheikh Tayyeb and other al-Azhar faculty the details of the program.  Despite the short time frame, Cone and the al-Azhar representatives decided that a January 2010 launch date was appropriate.

20.   To avoid delaying the implementation of the program, and in reliance on the UAE's agreement to fund the WLP, Cone continued to advance funds from her savings for WLP-related expenditures.  Up until the time that funding was actually received sometime later, all project costs had been, and continued to be, borne by Cone.

5

21.   Beginning in December 2009, Cone worked full-time on getting the program ready for the January 2010 start date, traveling frequently to Egypt to coordinate with representatives of al-Azhar in selecting the students, setting up the English language program, hiring instructors, purchasing books and supplies, arranging travel for the students, assisting them in securing passports and visas, and planning for the United States segment of the program.

22.   In December 2009, sixteen al-Azhar graduate students from the faculties of Islamic theology, law and religious texts were selected by al-Azhar faculty and Cone to participate in the program.  In addition, a group of culturally and religiously diverse doctoral students and seminarians from the United States were also invited to participate in the WLP.

23.   On January 15, 2010, and at his request, Cone sent Al- Otaiba a memorandum detailing the time-line for implementing the WLP, and describing the four phases of the program.  The memorandum also included the backgrounds of the al-Azhar students, and advised him that the intensive English language instruction was to begin on January 24, 2010.

24.   Sometime thereafter, Al-Otaiba  e-mailed Cone, once again confirming UAE's agreement to fund the WLP.

25.   When the English language program began in January, Cone worked directly with al-Azhar representatives in Cairo to implement the program, and was in Cairo from December 5, 2009 through January 9, 2010; from January 19 through February 13, 2010; and from March 23 through April 12, 2010.

26.   Although the International Institute at UM agreed to host the WLP, Cone received no day-to-day support or input from UM, or Professors Jackson or Tessler.

27.   On February 12, 2010, UM received a wire transfer from the Crown Prince of Abu Dhabi's bank in the UAE in the amount of $2,033,590.00, the same amount Cone had requested

in the budget to fund the WLP for 2010.  Until these funds were transferred, UM had refused to advance any funds to Cone to pay for the initial  expenses of the program (e.g., travel, instructors' salaries, text books) despite the fact that beginning in January 2010, WLP participants were receiving intensive English language instruction at al-Azhar.

28.   At the end of February 2010, the first WLP-related invoice, which included amounts advanced by Cone from June 2009 through February 2010, was submitted to UM in the amount of $218,000.  This invoice was finally paid at the end of April 2010.

29.   Throughout this period, Cone updated Al Otaiba often on the progress of the program.

30.   In mid-April 2010, while Cone was in Cairo, she learned that neither Professor Tessler nor Professor Jackson would be in Ann Arbor to help carry out the second and third phases of the program in May and June 2010.  When Cone e-mailed them about their absence, Professor Tessler responded that he knew of no arrangements to secure other faculty.

31.   Thereafter, Cone advised the al-Azhar officials of the departure of Professors Tessler and Jackson from the program.  Together, they decided that it would be appropriate to move the July portion of the program to some other university, and ultimately, Georgetown University agreed to host the WLP.

32. After the April 23, 2010 communication from Professor Tessler withdrawing from the program, Cone e-mailed Al Otaiba requesting a meeting.  Al Otaiba responded later that day that he could not meet with her until he returned to the office the following week.  Cone again e-mailed Al Otaiba on April 26, 2010.  Al Otaiba responded that he was busy with a UAE delegation in Washington, and that they would meet the following week.

33.   On April 28, 2010, Cone sent another e-mail, outlining the matters she wished to

discuss, and advising Al Otaiba that the Al-Azhar students were arriving as scheduled on May 8, 2010 for the United States portion of the English language program, to be held in Ann Arbor in May and June.  She further advised him that, with the full support of al-Azhar officials, the July conference would be moved to Georgetown University.  Cone also informed Al-Otaiba that she was going to Ann Arbor to run the May and June portions of the program.

34.   On April 29, 2010, UM emailed a letter to Al Otaiba stating that UM would not accept any further charges against the WLP funds after May 15, 2010, and that UM would be returning the remaining funds to the UAE. UM did ultimately return the funds the middle of July 2010.

35.   After learning that the funds would be returned to the UAE, Cone contacted Al Otaiba several times, including on April 29, 2010, to ensure that the program would go forward as planned and that the UAE would continue to pay for expenditures related to the WLP.   Cone advised Al Otaiba that in the meantime she and her staff would be expending personal funds to cover budgeted expenses in an effort to ensure that the WLP proceeded as planned, and informed him that, as a result, the students, who had already traveled to the United States, would suffer no interruption in their experiences under the program.

36.   The budgeted expenses at that time included airline flights for al-Azhar and American faculty and American students, hotel and meals for al-Azhar faculty while in the United States, faculty and student honoraria and per diem, student text books, school supplies, reading materials, staff salaries, and al-Azhar faculty and student visa application fees, transportation, meals and housing in Chicago, and transportation to Washington, D.C.

37.   On June 9, 2010, Cone and al-Husein Madhany, WLP director of operations and accounting, met with Al Otaiba at the UAE embassy in Washington, D.C.  During this meeting,

Al Otaiba had an opportunity to review the schedule for the July program at Georgetown, and he remarked that he was very impressed with the high caliber of the instructors and participants, adding that he knew many of the participants.

38.   During the meeting, Al Otaiba reaffirmed the UAE's support for the WLP, and stated that he would appoint a person from the UAE Embassy to handle Cone's WLP bills and reimbursements, and to coordinate the funding to Georgetown University.  He again reassured Cone that her WLP bills and Georgetown University would be promptly reimbursed once UM returned the remaining funds.  Al Otaiba requested that Cone ask UM to return the funds without delay, and accordingly, Cone e-mailed Tessler and relayed Al Otaiba's request.

39.   The Al-Azhar students arrived in Ann Arbor in the beginning of May 2010 for the second phase of the program: strengthening their English language skills and exposure to American life and culture.  The al-Azhar students' language skills improved with the continued formal English language instruction and their daily interaction with native English speakers in Ann Arbor.

40.   To help the al-Azhar students adapt to their new environment, WLP introduced them to young Muslim students as well as professionals and religious leaders, several of whom are graduates of al-Azhar, by hosting a welcoming event. The al-Azhar students received invitations weekly to meet with different Muslim American groups, to play soccer, and to attend Friday Jum'ah services.  Many of the al-Azhar students developed close relationships with members of the Muslim American community, helping them to improve their English language skills.

41.   Eventually, the al-Azhar students were introduced to other aspects of American cultural and political life, including participating in a roundtable discussion with the then Michigan gubernatorial candidate Rick Snyder, along with local Muslim business, religious and

community leaders.

42.  As a highlight of the program, the al-Azhar students traveled on a four-day trip to Chicago, Illinois, and attended the Inner-city Muslim Action Network (IMAN) music, art and cultural festival.

43.  Throughout June and July 2010, Cone and Al Otaiba exchanged emails relating to the WLP and the planning of the Georgetown University conference.  During this period, Al Otaiba was at all times aware that expenses for the WLP were being personally funded by Cone, and Al Otaiba agreed, on behalf of the UAE, to reimburse Cone for all program related expenses and services.

44.  The summer conference was held as planned at Georgetown University, and the WLP concluded with great success in July 2010.  The program not only provided academic learning (formal lectures, panels and roundtables, group discussions, site visits and peer-led small groups), but equally important, it provided the participants with an opportunity to live together in the dormitories, and share meals as well as sports and leisure activities.

45.  The UAE received widespread praise for its sponsorship of the program from the media, United States government officials, the White House and the National Security Council.

46.  On or about July 13, 2010, UM transferred approximately $1.2 million to the UAE Embassy bank account in Washington, D.C., after applying over $800,000 to expenses for the program, which included approximately $200,000 in overhead fees for UM and approximately $100,000 for UM faculty.  The budgeted expenses included student air travel, health insurance, housing, meals, English language course tuition (in the United States and in Egypt), text books, laptops, local transportation, and Cone's air travel and housing in Cairo.

47.  On or about July 16, 2010, after UM returned the funds to the UAE Embassy bank,

the UAE provided Georgetown University with approximately $400,000 to fund the summer

conference.  Georgetown expended approximately $360,000 in connection with program.  The

remaining $40,000 was returned to the UAE following the conclusion of the summer conference.

Georgetown University charged the WLP $34,000 for overhead fees.

48.   Upon the conclusion of the program in July 2010, Omar Al Shamsi ("Al Shamsi"),

the UAE Deputy Chief of Mission, was appointed by Al Otaiba to handle any outstanding

invoices related to the WLP, and to discuss the program for the following year.

49.   On July 22, 2010, al-Husein Madhany (WLP operations and accounting director),

met with Al Shamsi to discuss the outstanding invoices and the future of the WLP.  During that

meeting, Al Shamsi spoke highly of the program's results and offered to host an event at the

UAE Embassy for the 2011 summer program.  In addition, Al Shamsi requested that the WLP

submit an invoice for all outstanding amounts related to the program.

50.   Following several emails and telephone calls with UAE Embassy staff, and pursuant

to Al Shamsi's request, the invoice and detailed spreadsheets substantiating the costs incurred by

Cone and other WLP staff were hand-delivered to the UAE Embassy in October 2010.  The

invoice was in the amount of $438,155.68, and directed payment to a bank account of the World

Leadership Program Institute ("Institute"), a District of Columbia not-for-profit organization that

Cone had established.

51.   In early November 2010, at the request of Mr. Mustafa from the UAE Embassy

accounting department, Cone e-mailed another copy of the invoice.

52.   On December 7, 2010, Al Otaiba emailed Cone to inform her that the UAE had

decided not to fund year two of the program.  Nevertheless, Al Otaiba once again praised the

program, stating, "I know for a fact the program was an outstanding success as I've heard many

compliments from within the administration and elsewhere."

53.  The following day, Cone faxed Al Otaiba a letter again requesting that the UAE pay

the outstanding invoice.  Cone herself had paid the expenses of the other WLP staff.

54.  Following several emails requesting the status of payment, Cone submitted another

invoice in January 2011 in the same amount ($438,155.68) to Al Otaiba and Al Shamsi.  Along

with payments to UM and to Georgetown in the combined approximate amount of $1,193,590,

the total cost for the 2010 program was approximately $1,631,745.60, which was under the

amount set forth in the budget that Al Otaiba had approved in fall 2009.

55.  Al Shamsi's assistant responded via e-mail several weeks later, stating that an

attorney for the UAE, Byron Fogan ("Fogan"), would formally respond to Cone's invoice.

56.  Almost a month later, Fogan advised Cone by e-mail that the UAE would not pay the

WLP invoice.  Fogan conceded that the expenses were "legitimate," but stated that the UAE

"had spent too much" and did not want to pay any more bills associated with the program.

57.  Despite repeated requests for payment, the UAE has failed and refused to tender

payment for the outstanding invoices submitted by Cone.  Presently, $438,155.68 is due and

owing from the UAE to Cone.

## COUNT I - BREACH OF CONTRACT

58.  Plaintiff realleges and incorporates herein by reference Paragraphs 1-57 above as if

fully set forth herein.

59.  Cone and the UAE entered into an express contract pursuant to which the UAE

agreed to fund the WLP.   Both Cone and the UAE intended to be bound by their respective

promises.

60.  By virtue of their contract, the UAE is obligated to reimburse Cone for funds

expended to cover program-related expenses, and to compensate Cone for services rendered in making the WLP program a tremendous success.

61. The UAE breached the contract by failing and refusing to pay Cone for services and expenses related to the WLP.

62. Although the UAE funded portions of the WLP, Cone is still owed $438,155.68 which the UAE agreed to pay.

63. In material breach of its agreement, the UAE has failed and refused to pay Cone the remaining amounts owed. The UAE's material breach of its contract has proximately caused Cone to suffer damages in the amount of $438,155.68.

WHEREFORE, Plaintiff Margaret Cone demands judgment against Defendant The United Arab Emirates in an amount not less than $438,155.68, plus interest and costs, and for such other and further relief the Court deems necessary or proper.

## COUNT II - QUANTUM MERUIT (Implied in Fact Contract)

64. Plaintiff realleges and incorporates herein by reference Paragraphs 1-63 above as if fully set forth herein.

65. As alleged above, Cone, the WLP and the UAE entered into an express contract pursuant to which the UAE agreed to reimburse expenses paid by Cone relating to the WLP, and to pay for work performed by Cone in connection with the administration of the WLP. Alternatively, even if the parties did not enter into an express contract, Cone is entitled to recover under quantum meruit because a contract can be inferred by the parties' conduct.

66. Cone performed valuable services for the UAE in connection with the WLP and incurred expenses which were required for the WLP to proceed as planned. The UAE accepted and received the benefits of all the services performed by Cone and the expenses incurred by

Cone in connection with those services.   The circumstances under which Cone performed her services reasonably put the UAE on notice that Cone expected to be paid for services rendered and to be reimbursed for related expenses.

67.   Although the UAE funded portions of the WLP, Cone is still owed $438,155.68 which the UAE agreed to pay.

68.   In material breach of the parties' implied-in-fact agreement, the UAE has failed and refused to pay Cone the remaining amounts owed and has proximately caused Cone to suffer damages in the amount of $438,155.68.

WHEREFORE, Plaintiff Margaret Cone demands judgment against Defendant The United Arab Emirates in an amount not less than $438,155.68, plus interest and costs, and for such other and further relief the Court deems necessary or proper.

## COUNT III - UNJUST ENRICHMENT (Quasi-Contract)

69.   Plaintiff realleges and incorporates herein by reference Paragraphs 1-68 above as if fully set forth herein.

70.   As alleged above in Count I, Cone, and the UAE entered into an express contract pursuant to which the UAE agreed to reimburse expenses paid by Cone relating to the WLP, and to pay for work performed by Cone in connection with the administration of the WLP. Alternatively, as alleged in Count II, a contract should be implied in fact based on the conduct of the parties.  Even if the parties entered into neither an express nor an implied-in-fact contract, a contract should be implied in law, entitling Plaintiff Cone to recover for the UAE's unjust enrichment.

71.   The UAE was unjustly enriched at the expense of Cone.  The circumstances are such that in good conscience the UAE should be required to make restitution.  Cone performed

valuable services for the UAE in connection with the WLP and incurred expenses which were required for the WLP to proceed as planned.  It would be unjust if the UAE were not required to compensate Cone and the WLP the amounts owed, totaling $438,155.68, which the UAE agreed to pay.

WHEREFORE, Plaintiffs Margaret Cone demands judgment against Defendant The United Arab Emirates in an amount not less than $438,155.68, plus interest and costs, and for such other and further relief the Court deems necessary or proper.

## COUNT IV - PROMISSORY ESTOPPEL

72.  Plaintiff realleges and incorporates herein by reference Paragraphs 1-71 above as if fully set forth herein.

73.  As alleged above in Count I, Cone and the UAE entered into an express contract pursuant to which the UAE agreed to reimburse expenses paid by Cone relating to the WLP, and to pay for work performed by Cone in connection with the administration of the WLP. Alternatively, as alleged in Count II, a contract should be implied in fact based on the conduct of the parties.  Even if the parties entered into neither an express nor an implied-in-fact contract, a contract should be implied in law, entitling Plaintiffs to recover for the UAE's unjust enrichment.  Alternatively, as alleged in Count III, even if the parties entered into neither an express nor an implied-in-fact contract, a contract should be implied in law, entitling Plaintiffs to recover for the UAE's unjust enrichment.  Alternatively, as alleged in this Count IV, the UAE is estopped from not honoring its promises of payment to Cone and the WLP.

74.  The UAE promised to pay Cone for services performed relating to the WLP, including program-related expenses incurred by Cone in administering the WLP.  Cone and the WLP reasonably relied on the UAE's promises, and did in fact rely on the promises of the UAE

15

by rendering services and incurring expenses so as to allow the WLP to proceed as planned. Further, Cone devoted her full time and attention to the WLP, and accordingly was not able to engage in other employment.  As a consequence of the UAE's failure to honor its promises, Plaintiff has suffered real and actual economic loss, as described above.

WHEREFORE, Plaintiff Margaret Cone demands judgment against Defendant The United Arab Emirates in an amount not less than $438,155.68, plus interest and costs, and for such other and further relief the Court deems necessary or proper.

Respectfully submitted,

COOTER, MANGOLD, DECKELBAUM
 & KARAS, L.L.P.

 /s/ Dale A. Cooter
Dale A. Cooter (#227454)
Donna S. Mangold (#358851)
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015
(202) 537-0700
(202) 364-3664 (Fax)
efiling@cootermangold.com

*Counsel for Plaintiff Margaret Cone*